IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
Eastern Division

| | | |
|---|---|---|
| PRESTIGE HOME HEALTH CARE, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 1:25-cv-00270 |
| | ) | |
| XAVIER BECERRA, SECRETARY OF THE | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| HEALTH AND HUMAN SERVICES | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT FOR JUDICIAL REVIEW

Plaintiff, Prestige Home Health Care, Inc. ("Prestige"), by and through its undersigned legal counsel, hereby files this Complaint for Judicial Review against Defendant, Xavier Becerra, in his official capacity as the Secretary of the U.S. Department of Health and Human Services ("Secretary"), following the entry of an administrative order by the Medicare Appeals Council ("Council") as to Council docket number M-24-2756 and Office of Medicare Hearings and Appeals (OMHA) appeal number 3-9238666827A1, and in support thereof states as follows:

## STATEMENT OF THE CASE

1.     Prestige, a locally owned and operated home health care provider, brings this action to remedy the enormous harm inflicted on it through the Secretary's abusive and broken Medicare claim appeal system.

2.     Prestige previously underwent a post-payment audit of certain claims for reimbursement it submitted to the Medicare program between 2015 and 2019. Based on the results of that audit, the Secretary's contractor alleged that Prestige had been overpaid by the

Medicare program in the amount of $2,922,043. The contractor calculated this alleged overpayment using a flawed and unreliable statistical sampling process.

3. Prestige exercised its statutory right to contest the alleged overpayment through the Secretary's administrative appeals process. At almost every turn, Prestige's appeals were met with delay, mismanagement, and incompetence from the Secretary's agents.

4. For example, the Administrative Law Judge (ALJ) to whom Prestige's case was assigned took more than two years to hear and decide the appeal—despite a statutory requirement that ALJs adjudicate cases within 90 days. 42 U.S.C. § 1395ff(d)(1)(A); *see also Am. Hosp. Ass'n. v. Burwell*, 812 F.3d 183 (D.C. Cir. 2016).

5. The ALJ's eventual decision was, in effect, unfavorable to Prestige. Upon careful review of that decision, Prestige determined that the ALJ had merely copied and pasted virtually *all* of her findings and analysis from one of the prior appeal decisions issued in the case. This is an egregious violation of applicable regulations that require ALJs to review cases *de novo* and make independent findings of fact and conclusions of law. 42 C.F.R. §§ 405.1000(d), 405.1046(a)(1).

6. Prestige filed an appeal with the Council to challenge the ALJ's outrageous and illegal decision. After 90 days elapsed and the Council had not issued a decision, Prestige invoked its statutory right to bypass the Council and "escalate" its case to federal court. 42 U.S.C. § 1395ff(d)(3)(B). Instead of honoring Prestige's request, the Council unlawfully remanded the case back to the ALJ.

7. The ALJ addressed the issues in the remand order without the need for further proceedings and then returned the case to the Council. After 90 additional days had passed, Prestige once again sought to escalate its appeal to federal court. Instead of approving Prestige's

request within 5 days—as required by agency regulations—the Council inexplicably took *11 months* to confirm Prestige was entitled to escalation.

8.      While Prestige navigated its way through the agency's Kafkaesque appeals system, interest continued to accrue on the alleged overpayment at the exorbitant annual rate of 10.625%.

9.      Prestige now seeks an order from this Court declaring the agency's final decision to be (1) unlawful; (2) unsupported by substantial evidence; and (3) arbitrary and capricious. Prestige also requests an award of any and all damages, penalties, costs, and attorneys' fees to the maximum extent allowable under law.

## PARTIES

10.      Prestige is a corporation organized under the laws of the State of Illinois. Prestige's principal place of business is located at 9944 South Roberts Road, Suite 101, Palos Hills, IL 60465.

11.      Xavier Becerra is the Secretary of the U.S. Department of Health and Human Services (HHS) and the proper Defendant in this action pursuant to 42 C.F.R. § 405.1136(d)(1).

## JURISDICTION AND VENUE

12.      The Court has jurisdiction over this action pursuant to 42 U.S.C. § 1395ff(b)(1)(A) (incorporating by reference 42 U.S.C. § 405(g)), which authorizes judicial review of the Secretary's final decision.

13.      Venue is proper pursuant to 42 U.S.C. § 1395ff(b)(1)(A) because Prestige's principal place of business is located in this judicial district.

14.      The amount in controversy exceeds the jurisdictional requirement set forth at 42 U.S.C. § 1395ff(b)(1)(E)(i).

15.     This action has been initiated within 60 days of the Council's administrative order dated November 15, 2024, as required by 42 C.F.R. § 405.1132(b).

## MEDICARE COVERAGE OF HOME HEALTH SERVICES

16.     Medicare is the federal health insurance program for the elderly and disabled established in 1965. The Medicare statute is codified at 42 U.S.C. § 1395 *et seq.*

17.     The Medicare program is administered by the Centers for Medicare and Medicaid Services (CMS), which is an agency within HHS.

18.     Home health services include but are not limited to nursing care, physical therapy, occupational therapy, speech therapy, medical social services, and home health aide care.

19.     Medicare covers reasonable and necessary home health services furnished to eligible beneficiaries. To qualify for the Medicare home health benefit, a beneficiary must require "skilled" care on an intermittent (i.e., less-than-daily) basis, be confined to the home, and be under the care of a physician who certifies his or her eligibility for home care. *See* 42 U.S.C. § 1395n(a)(2)(A); 42 C.F.R. § 409.42.

20.     A beneficiary is considered confined to the home where he or she has a condition due to illness or injury that restricts his or her ability to leave home, except with the aid of a supportive device (e.g., a cane or walker), special transportation, or another person. A beneficiary will also be considered homebound if leaving the home would be medically contraindicated. The beneficiary's condition should be such that leaving home would require a considerable and taxing effort and that the beneficiary is normally unable to leave home. 42 U.S.C. § 1395f(a).

21.     A beneficiary must be under the care of a physician who certifies that he or she is confined to the home and requires intermittent skilled care. The physician must establish and

periodically review a plan of treatment for the home health services. The physician's certification must be accompanied by documentation of a face-to-face encounter with the beneficiary that corroborates the beneficiary's homebound status and need for skilled care. 42 C.F.R. §§ 409.43, 424.22(a)(1)(v).

22.    Home health services must be "skilled" according to Medicare coverage guidelines. A "skilled" service is one that is so inherently complex that it can only be safely and effectively rendered by licensed or technical personnel, such as nurses or therapists. *See* 42 C.F.R. §§ 409.44(b)(1), 409.44(c)(2)(ii)

23.    To be covered by Medicare, skilled nursing services must be reasonable and necessary for the treatment of a beneficiary's illness or injury in the context of that beneficiary's medical condition. The services must be consistent with the nature and severity of the beneficiary's condition, unique medical needs, and accepted standards of medical and nursing practice. *Id.* § 409.44(b)(3).

24.    Beneficiaries are entitled to receive skilled nursing care for medical conditions that are acute, chronic, terminal, or expected to last a long time. *Id.* § 409.44(b)(3)(iii).

25.    To be covered by Medicare, skilled therapy services must be: (1) considered under accepted standards of medical practice to be safe and effective treatment for the beneficiary's condition; (2) provided with the expectation that the beneficiary's condition will improve in a reasonable and generally predictable period of time; and (3) provided in an amount and at a frequency and duration that is reasonable. *Id.* § 409.44(c)(2).

26.    CMS regulations at 42 C.F.R. § 409.33 and sub-regulatory guidance in Chapter 7 of the Medicare Benefit Policy Manual (MBPM) set forth several examples of skilled nursing services that are covered under the Medicare home health benefit, including but not limited to

observation and assessment of a beneficiary's condition or teaching and training activities.

27.     Nursing services for observation and assessment are covered by Medicare where the skills of a licensed nurse are required to identify and evaluate the potential for a complication or acute change in a beneficiary's condition. 42 C.F.R. § 409.33(a)(2); MBPM Ch. 7 § 40.1.2.1.

28.     Nursing services for teaching and training are covered by Medicare where the skills of a licensed nurse are required to instruct a beneficiary (or the beneficiary's caregiver) as to management of his or her treatment regimen. 42 C.F.R. § 409.33(a)(3); MBPM Ch. 7 § 40.1.2.3.

29.     CMS regulations at 42 C.F.R. § 409.33 and sub-regulatory guidance in Chapter 7 of the Medicare Benefit Policy Manual set forth examples of skilled therapy services that are covered under the Medicare home health benefit, including but not limited to evaluation of a beneficiary's functional status, therapeutic exercises, gait training, and range of motion exercises.

## MEDICARE CLAIM AUDITS AND APPEALS

30.     CMS contracts with private entities to perform various functions on its behalf, including but not limited to provider and beneficiary enrollment, claims processing, medical review audits, and adjudication of administrative claim appeals. *See, e.g.,* 42 U.S.C. § 1395kk-1.

31.     Medicare claims are processed by contractors called Medicare Administrative Contractors (MACs). Claim audits are undertaken by several different CMS contractors, such as Unified Program Integrity Contractors (UPICs). MACs, along with separate entities known as Qualified Independent Contractors (QICs), are also responsible for handling administrative claim appeals. *See* 42 U.S.C. §§ 1395ff(c), 1395kk-1, 1395ddd(b)-(c).

32.     CMS' contractors may perform claim audits on a post-payment basis to ensure claims met applicable Medicare criteria for coverage and reimbursement at the time they were

submitted. If a claim is denied as part of a post-payment audit, then the provider is responsible for repaying any resulting overpayment associated with the claim.

33.     Providers who are dissatisfied with an adverse claim determination may contest that decision through a four-step administrative appeals process. *See* 42 U.S.C. § 1395ff(b).

34.     The four steps in CMS' administrative claim appeal process are as follows: redetermination, reconsideration, a hearing before an ALJ, and review by the Council.

35.     Requests for redetermination are processed by MACs. Requests for reconsideration are handled by QICs. Hearing requests are adjudicated by OMHA ALJs. The Council is a component of the Secretary's office.

36.     ALJs usually conduct hearings by telephone. An appellant may be represented by counsel, present witness testimony, and make arguments regarding the issues in the case. The issues to be addressed in the hearing usually include all issues raised as part of the initial determination, redetermination, and reconsideration. 42 C.F.R. § 405.1032(a).

37.     ALJs review cases *de novo*. Agency regulations require ALJs to issue decisions that take into account all of the evidence offered at the hearing or otherwise admitted into the administrative record. Hearing decisions must contain, among other things, independent findings of fact and conclusions of law. 42 C.F.R. §§ 405.1000(d), 405.1046(a)(1).

38.     If an appellant is dissatisfied with an ALJ's decision, it may seek review of that decision before the Council.

39.     If the Council is unable to adjudicate a request for review within 90 days of receipt, an appellant may file a request to "escalate" its appeal to federal court. Within five days of receiving an appellant's escalation request, the Council must either render a decision or confirm it is unable to issue a decision and permit the appellant to seek review in federal court.

40.     In a case where an appellant escalates a pending appeal from the Council to federal court, the ALJ's decision becomes the Secretary's final decision for purposes of judicial review. *See Ashli Healthcare, Inc. v. Becerra*, 2024 WL 389104, *1 (E.D. Cal. August 21, 2024).

## STATISTICAL SAMPLING FOR OVERPAYMENT ESTIMATION

41.     Due to the large volume of claims submitted to the Medicare program each year, it is in most cases neither feasible nor practical for CMS' contractors to perform post-payment audits of individual claims.

42.     In 1986, CMS issued an administrative ruling establishing its right to utilize statistical sampling methodologies to project (or "extrapolate") overpayments to providers upon review of a statistically valid sample of a provider's claims.

43.     Medicare guidelines for sampling and extrapolation are contained in Chapter 8 of the Medicare Program Integrity Manual (MPIM), which is a sub-regulatory guidance document. The provisions of the MPIM are binding on CMS' contractors.

44.     According to the MPIM, the major steps in statistical sampling are: (1) identifying the provider; (2) selecting the period to be reviewed; (3) defining the universe and the sampling unit and constructing the sampling frame; (4) assessing the distribution of the paid amounts in the sample frame to determine the sample design; (5) performing the appropriate assessments to determine whether the sample size is sufficient for the statistical analyses used, and identifying the corresponding confidence interval; (6) designing the sampling plan and selecting the sample from the sampling frame; (7) examining each of the sampling units to determine if there was an overpayment or an underpayment; and (8) estimating the overpayment (i.e., projecting the overpayment to the universe of claims).

45.     The "universe" of a provider's Medicare claims consists of all claims submitted

by the provider within a certain timeframe. The contractor then applies various limiting criteria to the universe based on the nature and scope of its audit. For example, the contractor may wish to limit the population of claims to certain types of claims or claims for certain services.

46.     Once the limiting criteria are applied to the universe, the resulting dataset is called the "sampling frame." The sampling frame is an ordered list of all possible sampling units. The sampling units are the claims or individual services to be reviewed during the audit.

47.     The sampling units are chosen from the frame using a series of random numbers generated by a computer algorithm. In cases like this one where the sampling unit is the claim, the random numbers produced by the computer algorithm are matched with the position numbers of the claims in the sampling frame. The claims matched in this manner are chosen to serve as the claims comprising the sample.

48.     The contractor must create a sampling plan and finalize it before the sample claims are selected. Without such documentation, the contractor would be free to select any sample it wished as opposed to the sample generated according to the parameters in the sampling plan.

49.     The sample design documentation must sufficiently describe the method by which the sampling frame is sorted (e.g., according to claim number, claim payment amount, etc.). Without this information, it is impossible to recreate the sampling frame and, by extension, the sample itself.

50.     Once the sample of claims is constructed, each claim is reviewed by the contractor's medical review staff. The reviewer may determine that a claim was correctly paid, incorrectly paid, or that it should be paid at a different amount from that which was originally paid to the provider.

51.     Upon completion of the medical records review, the contractor's staff calculates the amount by which the provider was overpaid for the sampled claims. The contractor computes the projected overpayment by multiplying the mean net overpayment amount from the sample by the total number of sampling units in the frame.

52.     Medicare contractors are required to maintain complete documentation of the sampling methodology that is utilized in each case. This documentation includes, but is not limited to the universe, sampling frame, sampling plan, and random numbers used in the sample selection process.

53.     When contesting an extrapolated overpayment determination through the Medicare claim appeal process, a provider has a right to challenge the accuracy or validity of the contractor's sampling methodology.

54.     CMS manual instructions require contractors to maintain all data files and workpapers related to an extrapolated overpayment determination in the event the sampling methodology is challenged on appeal. These files must be sufficient to enable independent replication of the sampling frame, sample of claims, and extrapolated overpayment amount. CMS also requires its contractors to make all such data files and work papers available for review.

55.     When sampling for the purposes of extrapolation, Medicare contractors are required to draw a statistically valid random sample and utilize only statistically valid methods to project an overpayment.

## FACTUAL AND PROCEDURAL BACKGROUND

56.     At all times relevant hereto, Prestige was a Medicare-certified provider of home health services. Prestige provides high quality home health services to the residents of the

Chicagoland area, many of whom are Medicare beneficiaries.

57.     At all times relevant hereto, AdvanceMed Corporation (AdvanceMed") was a UPIC whose jurisdiction included the State of Illinois.

58.     In a letter dated February 25, 2019, AdvanceMed provided notice of its intent to conduct a post-payment audit of certain home health services billed by Prestige to the Medicare program between 2015 and 2019. This audit covered 33 claims for services rendered to various Medicare beneficiaries. Prestige submitted copies of its medical records to the UPIC as requested.

59.     In a letter dated August 12, 2019, AdvanceMed alleged that 91% of the claims under review failed to meet Medicare coverage criteria in whole or in part. The UPIC further asserted that the claims it reviewed constituted a statistically valid sample of Prestige's claims for the audit period in question and thereby extrapolated an alleged Medicare overpayment in the amount of $2,922,043.

60.     Prestige promptly filed a request for redetermination with Palmetto GBA, the responsible MAC. In a partially favorable notice of redetermination dated November 13, 2019, the MAC overturned two unfavorable claim determinations in part and affirmed all other aspects of the extrapolated overpayment assessment.

61.     Prestige then sought reconsideration with the QIC, Maximus Federal Services ("Maximus"). On or around March 24, 2020, the QIC rendered a partially favorable reconsideration decision that reversed 2 unfavorable claim decisions in full and 10 unfavorable claim decisions in part. Maximus agreed with the remaining adverse claim determinations and upheld AdvanceMed's use of statistical sampling to calculate the alleged overpayment.

62.     Based on the partially favorable redetermination and reconsideration decisions, the contractor recomputed the extrapolated overpayment amount to be $1,452,147.

63.     On May 20, 2020, Prestige requested a hearing before an ALJ to challenge the unfavorable aspects of the QIC's reconsidered determination. The ALJ to whom the case was assigned held an evidentiary hearing two years later on May 19, 2022. Prestige presented witness testimony from Verona Boothe, RN, Ph.D. regarding the clinical issues in the case and Ross Mitchell Cox, Ph.D. regarding the statistical sampling and extrapolation.

64.     In a decision dated September 12, 2022, which was incorrectly styled as partially favorable, the ALJ upheld the remaining adverse claim determinations and determined that the UPIC's statistical sampling methodology was valid.[1]

65.     Upon review of the hearing decision, Prestige discovered that the ALJ had largely duplicated the QIC's claim determinations from the notice of reconsideration for virtually all of the remaining denied claims. For example, with respect to beneficiary G.W., the QIC's decision was as follows:

> Home health services were ordered by the beneficiary's physician and began initially on February 18, 2015. Polyneuropathy was the beneficiary's primary medical diagnosis.
>
> Past medical history relevant to services included arthritis, hypertension, type II diabetes mellitus, and spinal stenosis.
>
> Services were designed to address self-care, safety, and knowledge deficits, and included contributions from nursing. Treatment included assessing vital signs, medication compliance, pain levels, managing home safety, fall prevention, skin integrity, instruction on medical appointment follow through, standard precautions, and diet, and assistance with activities of daily living (ADLs), and was designed around education, verbalizing signs and symptoms of disease processes, home safety guidelines, signs and symptoms of infection, maintaining optimal skin integrity, reduction of pain levels, and verbalizing understanding of disease processes.
>
> The period under review extended from April 13, 2016 to June 9, 2016. The services at issue include nursing visits for medication compliance, education, and assessments.

---

[1] The ALJ characterized her decision as partially favorable because she agreed with the QIC's favorable and partially favorable claim determinations. However, pursuant to 42 C.F.R. § 405.1032(a), the favorable aspects of the QIC's determination were not properly before the ALJ. The result of the ALJ's decision was to affirm the unfavorable aspects of the QIC's decision in their entirety.

Coverage of the services at issue cannot be provided. <u>Although the beneficiary was homebound, the services provided to the beneficiary did not require the unique skills of a</u> licensed therapist or <u>nurse for safe and effective delivery.</u> Specifically, the nursing services are repetitive. <u>There was no documentation for the visit on April 13, 2016.</u> (emphasis added).

The ALJ found the following in her decision for this claim:

<u>Home health services were ordered by the beneficiary's physician and began initially on February 18, 2015. Polyneuropathy was the beneficiary's primary medial diagnosis. Past medical history relevant to services included arthritis, hypertension, type II diabetes mellitus, spinal stenosis, fibroma of left foot, and cellulitis in diabetic foot. Services were designed to address self-care, safety, and knowledge deficits and included contributions from nursing. Treatment included assessing vital signs, medication compliance, pain levels, managing home safety, fall prevention, skin integrity, instruction on medical appointment follow through, standard precautions, and diet, and assistance with activities of daily living (ADLs), and was designed around education, verbalizing signs and symptoms of disease processes, reduction of pain levels, and verbalizing understanding of disease processes. The period under review extended from April 13, 2016 to June 9, 2016. The services at issue include nursing visits for medication compliance, education, and assessments.</u> The services provided do not meet Medicare coverage criteria. <u>Although the beneficiary was homebound, the nursing services provided did not require the unique skills of a nurse for safe and effective delivery. There was no documentation for the visit on April 13, 2016.</u> (emphasis added, citation omitted).

As is apparent from the underlined sections of the decisions, the ALJ merely replicated QIC's decision—even including the grammatical errors in the third paragraph of Maximus' determination.

66.     As another example, Maximus rendered the following decision with respect to the claim for beneficiary F.D.:

<u>Home health services were ordered by the beneficiary's physician and began initially on March 7, 2015. Hypertension was the beneficiary's primary medical diagnosis. Past medical history relevant to services included hypercholesterolemia and arthropathy.</u>

<u>Services were designed to address self-care, safety, and knowledge deficits, and included contributions from nursing. Treatment included assessing vital signs, medication compliance, pain levels, managing home safety, fall prevention, skin integrity, instruction on medical appointment follow through, standard precautions, and diet, and assistance with activities of daily living (ADLs), and was designed around education, verbalizing signs and symptoms of disease processes, home safety guidelines, signs and symptoms of infection, maintaining optimal skin integrity, reduction of pain levels, and verbalizing</u>

understanding of disease processes.

The period under review extended from July 5, 2015 to September 2, 2015. The services at issue included nursing visits for medication compliance, education, and assessments.

Coverage of the services at issue cannot be provided. Although the beneficiary was homebound, the services provided did not require the unique skills of a licensed therapist or nursing for safe and effective delivery. Specifically, the nursing skills [sic] are repetitive. (emphasis added).

The ALJ's decision for the same claim was virtually identical to that of the QIC:

Home health services were ordered by the beneficiary's physician and began initially on March 7, 2015. Hypertension was the beneficiary's primary medical diagnosis. Past medical history relevant to services included hypercholesterolemia and arthropathy. Services were designed to address self-care, safety, and knowledge deficits, and included contributions from nursing. Treatment included assessing vital signs, medication compliance, pain levels, managing home safety, fall prevention, skin integrity, instruction on medical appointment follow through, standard precautions, and diet, and assistance with activities of daily living (ADLs), and was designed around education, verbalizing signs and symptoms of infection, maintaining optimal skin integrity, reduction of pain levels, and verbalizing understanding of disease processes. The period under review extended from July 5, 2015 to September 2, 2015. The services at issue include nursing visits for medication compliance, education, and assessments. The services provided do not meet Medicare coverage criteria. Although the beneficiary was homebound, the services provided to the beneficiary did not require the unique skills of a licensed therapist or nurse for safe and effective delivery. (emphasis added).

Once again, a comparison of the underlined passages from the respective decisions demonstrates that the ALJ did not perform a *de novo* review of the claim or make independent findings of fact and conclusions of law.

67.     The same pattern of egregious duplication described above repeats itself throughout the ALJ's decision. In some cases, the ALJ's analysis contains additional legal errors.

68.     For example, the ALJ replicated the QIC's determination for the claim for beneficiary L.F. Although the ALJ slightly adjusted the basis for denial, she couldn't be bothered to even render a complete explanation for her decision. The ALJ's determination in this case states in relevant part: "Specifically, the face to face [sic] encounter documentation and

certifications were not dated and the (Exhibit 23, pgs. 13 and 158)."[2]

69.     In two other cases, the ALJ changed the denial rationales after repeating most of the QIC's determinations. These claims, for beneficiaries V.R. and P.S., both involved therapy services, and the ALJ concluded that those services were not reasonable and necessary because there was "no significant improvement and restoration of the [beneficiaries'] functioning." The ALJ's basis for this determination was that the beneficiaries' conditions allegedly remained the same while undergoing skilled therapy services.

70.     The ALJ's bases for denial in the cases of beneficiaries V.R. and P.S. contravenes CMS coverage rules for home health therapy services. While Medicare regulations require an *expectation* that a beneficiary's condition will improve materially with the receipt of skilled therapy services, there is no requirement that beneficiaries demonstrate actual functional improvement as a condition of coverage. CMS confirms this in its policy manual when it states: "Coverage [of home health therapy services] does not turn on the presence or absence of an individual's potential for improvement, but rather on the beneficiary's need for skilled care." MBPM Ch. 7 § 40.2.

71.     More generally, the ALJ's coverage determinations are incorrect because the supporting medical records establish that the nursing and physical therapy services provided to the beneficiaries were sufficiently complex such that they could only have been safely and effectively rendered by licensed personnel.

72.     In cases where beneficiaries received skilled nursing care, the records contain evidence of abnormal clinical findings such as fluctuating vital signs, weight changes, edema, and respiratory changes—all of which indicate that a reasonable potential for change existed in

---

[2] The existing portion of the ALJ's decision for beneficiary L.F. is not supported by substantial evidence. The home health certification and plan of care was dated July 1, 2015 to August 29, 2015, and the physician signed this document on July 6, 2015. The face-to-face encounter was dated May 1, 2014.

the beneficiaries' conditions. Therefore, the beneficiaries required and received skilled observation and assessment services consistent with MBPM Ch. 7 § 40.1.2.1.

73.     For claims involving skilled nursing services, the records further demonstrate that the beneficiaries exhibited knowledge deficits with respect to things like management of their disease processes, medication compliance, and home safety. The teaching provided by the home health nurses was consistent with the beneficiaries' overall conditions, medical histories, and disease processes. Therefore, the beneficiaries required and received skilled teaching and training services consistent with MBPM Ch. 7 § 40.1.2.3.

74.     In cases where beneficiaries received skilled therapy services, the record demonstrates that each beneficiary suffered a functional decline relative to his or her baseline status. Skilled therapy services were required to address those functional deficits due to the beneficiaries' comorbid conditions, medical histories, and/or complicating factors including but not limited to pain or shortness of breath with exertion.

75.     As for the extrapolation, the ALJ generally concluded that, "AdvanceMed's statistical analysis is valid and complies with the requirements [for extrapolation established by CMS]." However, the ALJ articulated almost no specific findings of fact to support this generic conclusion.

76.     In her analysis of the sampling methodology, the ALJ found that AdvanceMed had reviewed claims for the period March 1, 2015 through January 28, 2019 and constructed a stratified sample of 536 claims. AdvanceMed's sampling plan, however, shows that the audit period was February 28, 2015 through February 20, 2019. Further, AdvanceMed used a simple random sample of 33 claims to conduct its audit and extrapolation. The ALJ's minimal factual findings with respect to the extrapolation issue are hence not supported by substantial evidence.

77.    On November 8, 2022, Prestige filed an appeal with the Council seeking review of the ALJ's decision.

78.    The Council's 90-day adjudication period for Prestige's appeal expired on February 6, 2023. On March 2, 2023, Prestige submitted a request to the Council to escalate the pending appeal to federal court.

79.    On March 9, 2023, the Council issued an unlawful order whereby it remanded the case back to the ALJ because the administrative record was purportedly incomplete. This order was unlawful because agency regulations require the Council to act on escalation requests within 5 calendar days, and the Council's remand order was dated 7 calendar dates after the Council received Prestige's escalation request.

80.    Prestige did not receive any further correspondence about the case for many months, so Prestige's counsel contacted the ALJ's office to inquire as to the status of the remand order.

81.    Shortly after counsel's communication with the ALJ's office, Prestige received a copy of a letter sent by the ALJ to the Council on or around December 21, 2023. In that correspondence, the ALJ stated that her staff was able to remedy the issues raised in the Council's remand order and subsequently returned the case to the Council on March 28, 2023. The ALJ noted in her correspondence that she apparently failed to notify the Council or Prestige of this fact.

82.    Once the ALJ returned the case to the Council on March 28, 2023, the Council's 90-day adjudication period expired on June 26, 2023. Prestige, acting through counsel, later submitted a second request to escalate the case to federal court dated January 8, 2024.

83.    The Council did not respond to Prestige's escalation request by the 5-day deadline

set forth in 42 C.F.R. § 405.1132(a).

84. Prestige's attorney contacted the Council via telephone and e-mail on February 8, 2024, March 12, 2024, April 22, 2024, and August 14, 2024 to inquire as to the status of the escalation request. Council representatives either did not respond to these inquiries or refused to provide any updates as to the status of the case.

85. On November 15, 2024, the Council issued an administrative order confirming that it was unable to adjudicate Prestige's request for review within 90 days of receipt. The Council's order confirmed Prestige could escalate its appeal to federal court.

86. The ALJ's decision is the final agency decision in this matter pursuant to 42 U.S.C. § 1395ff(b)(1)(A). Prestige has thus exhausted its administrative remedies, and this case is eligible for judicial review.

## COUNT I – CORRECT LEGAL STANDARDS

87. Plaintiff hereby incorporates by reference paragraphs 1 through 86 herein.

88. The ALJ's decision upholding the contractor's use of statistical sampling does not articulate a sufficient connection between the facts found and the choice made and is therefore arbitrary and capricious. The ALJ did not make any independent findings of fact or conclusions of law regarding any of Prestige's arguments challenging the validity of the sampling methodology.

89. The ALJ's decisions upholding the adverse claim decisions are flawed because the ALJ did not perform a *de novo* review or make independent findings of fact or conclusions of law with respect to those claims.

90. The ALJ's claim determinations are conclusory and generic. The ALJ's decisions lack sufficient substance to enable the Court to determine whether those determinations are

supported by substantial evidence and correctly apply the relevant legal standards.

91.     The ALJ failed to properly apply the relevant legal standards with respect to Medicare coverage for home health services, ALJ decisions, and statistical sampling and extrapolation.

## COUNT II – SUBSTANTIAL EVIDENCE

92.     Plaintiff hereby incorporates by reference paragraphs 1 through 91 herein.

93.     The ALJ's decision upholding the extrapolated overpayment is unsupported by substantial evidence because the record belies the ALJ's factual findings that the audit period in this case was March 1, 2015 through January 28, 2019, the sample was a stratified sample, and that the sample included 536 claims.

94.     The ALJ's coverage decisions are unsupported by substantial evidence because the medical records establish that the nursing and therapy services in question were so complex that they could have only been safely and effectively provided by licensed personnel.

95.     No reasonable mind would accept the evidence cited by the ALJ in her unfavorable coverage decisions as sufficient to support the conclusion that the corresponding claims are not covered by Medicare.

96.     In reaching the unfavorable coverage determinations referenced herein, the ALJ failed to appropriately consider evidence that fairly detracted from her decisions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

97.     Reverse the ALJ's decision upholding the use of statistical sampling to extrapolate the alleged Medicare overpayment.

98.     Reverse the ALJ's decisions that Medicare coverage does not exist for the

remaining denied claims.

99.    Award Prestige all costs and attorneys' fees for this action as allowed under applicable law.

100.    Grant to Prestige any other legal or equitable relief that the Court may deem just and proper.


Respectfully Submitted,


Dated: January 9, 2024                    /s/ Adam L. Bird
                                          Adam L. Bird
                                          MD Bar No. 101214006
                                          CALHOUN BHELLA & SECHREST LLP
                                          2121 Wisconsin Avenue N.W., Suite 200
                                          Washington, D.C. 20007
                                          Tel: (202) 804-6031
                                          Fax: (214) 981-9203
                                          abird@cbsattorneys.com

                                          **Attorney for Plaintiff**